SCOTT L. OLIVER – Oregon SBN#181034
GREENBERG TRAURIG, LLP
1900 University Ave, 5th Floor
East Palo Alto, CA 94303
Telephone: (650) 289-7821
soliver@gtlaw.com

KURT A. KAPPES – *Pro Hac Vice Application Forthcoming*
LUPE R. LAGUNA – *Pro Hac Vice Application Forthcoming*
GREENBERG TRAURIG, LLP
1201 K Street, Suite 1100
Sacramento, CA 95814-3938
Telephone: (916) 442-1111
kappesk@gtlaw.com
lagunal@gtlaw.com

*Counsel for Plaintiff E*TRADE SAVINGS BANK*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

**EUGENE DIVISION**

| | |
|---|---|
| E*TRADE SAVINGS BANK, | ) |
| Plaintiff, | ) CASE NO. |
| v. | ) |
| ANDREW LLOYD, an Individual, | ) COMPLAINT FOR DAMAGES: |
| Defendant. | )  1. BREACH OF CONTRACT (28 U.S.C. § 1332) |
| | ) DEMAND FOR JURY TRIAL |

Plaintiff, E*TRADE SAVINGS BANK ("E*TRADE" or "Plaintiff") asserts the following claims against Defendant ANDREW LLOYD ("LLOYD" or "Defendant"):

**PARTIES**

1.  E*TRADE is a federally chartered savings bank with its principal place of business located at 671 North Glebe Road, Arlington, Virginia.

2.  E*TRADE is informed and believes that LLOYD is a resident of the State of Oregon and

resides in Lebanon, Oregon.

**JURISDICTION AND VENUE**

3. This Court has jurisdiction over this Complaint under 28 U.S.C. § 1332(a) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs (here, at least $1,148,963.59), and is between citizens of different states (here, Virginia and Oregon).

4. This Court has personal jurisdiction over Defendant because Defendant is an Oregon resident.

5. Venue is proper as Defendant resides in Lebanon, Oregon which is located within the jurisdiction of the United States District Court for the District of Oregon, Eugene Division. *See* 28 U.S.C. § 1391(b)(1).

**FACTUAL ALLEGATIONS**

6. On or around June 24, 2020, LLOYD entered into an E*TRADE Line of Credit and Security Agreement ("the Security Agreement") with E*TRADE. A true and correct copy of the Security Agreement is attached hereto as **Exhibit A**.

7. Under the terms of the Security Agreement, LLOYD's line of credit was secured by the E*TRADE securities account identified in Exhibit "A" to the Security Agreement ("the Collateral Account"). The Collateral Account was valued at approximately $5 million.

8. To ensure the adequacy and security of the Collateral Account, the Security Agreement required the Collateral Account to contain a minimum value of collateral to secure the credit advances ("the Maintenance Requirement"). E*TRADE specifically reserved the right, at its discretion, to require the deposit of additional collateral in the Collateral Account and to set the Maintenance Requirement at a higher or lower amount with respect to particular assets, accounts, or classes of assets or accounts as E*TRADE deems necessary.

9. E*TRADE further reserved the right to require Borrower at any time to deposit in each or any Collateral Account substitute, new, or additional Collateral for any Collateral that has previously been deposited in such Collateral Accounts. In making these determinations, E*TRADE is permitted to consider various factors, including but not limited to the value of the Collateral Account, the liquidity of a position, the investment rating, or concentrations of securities in a Collateral Account.

10. LLOYD agreed to maintain Collateral in the Collateral Accounts that has a value at least equal to the Maintenance Requirement. The Security Agreement states that if LLOYD "fails to satisfy the Maintenance Requirement or otherwise fails to meet a call for additional Collateral with respect to a Collateral Account, Bank, without limiting its right to do so at any time, may terminate the Line of Credit, demand payment of the Obligations, and liquidate some or all of the Collateral held by Pledgor in the Collateral Account."

11. LLOYD further agreed to pay E*TRADE "all Credit Advances plus all other liabilities and indebtedness incurred in connection with the Line of Credit, including all accrued and unpaid finance charges, any deficiency remaining in any Collateral Accounts in the event of the liquidation thereof, and all fees, costs (including collection costs and attorney fees), amounts due, expenses, and other charges hereunder or under any other Line of Credit Documentation (collectively, Obligations) immediately upon demand."

12. On or about October 21, 2020, E*TRADE terminated LLOYD's line of credit, accelerated the loan, and made a demand for repayment.

13. On or about November 4, 2020, LLOYD initiated an account transfer for the Collateral Account and transferred the majority of his funds out of the Collateral Account and into an account affiliated with the financial institution Charles Schwab.

14. As of November 9, 2020, the total amount outstanding under the Security Agreement is $1,148,963.59 with interest continuing to accrue at a daily rate of $76.09. After the November 4, 2020, transfer, LLOYD's Collateral Account only contains approximately $24,000 in equity, which places LLOYD below the Maintenance Requirement.

15. E*TRADE has attempted to reach LLOYD and demand additional funds be deposited in the Collateral Account and for payment of the Security Agreement balance, but LLOYD has been non-responsive.

16. On or about November 4, 2020, E*TRADE sent LLOYD a letter advising him that there was insufficient collateral in the Collateral Account. A true and correct copy of this letter is attached hereto as **Exhibit B**.

17. E*TRADE further instructed LLOYD that, "As a result of this action, your credit line has

been restricted from taking any further credit advances. **Additionally, you will be required to pay off and close your line of credit account no later than November 4, 2020. If you do not take action to payoff and close your account prior to this date, E*TRADE Savings Bank will take liquidation action to complete these actions on your behalf**."

18. The letter advised LLOYD that if he had any questions, he should contact E*TRADE at the number provided.

**FIRST CLAIM FOR RELIEF**

**(BREACH OF CONTRACT)**

19. E*TRADE re-alleges and incorporates by reference the allegations of paragraphs 1 through 18, inclusive, of this Complaint, as though fully set forth herein.

20. E*TRADE and LLOYD are parties to a valid and enforceable contract, namely the Security Agreement.

21. LLOYD has breached the terms of the Security Agreement by, among other things, failing to maintain sufficient collateral in the Collateral Account and/or refusing to repay the amounts due and owing thereunder upon demand.

22. As a direct and proximate result of LLOYD's breach, E*TRADE has suffered and will continue to suffer direct, incidental, and consequential damages in an amount to be proven at trial, but in any event not less than $1,148,963.59 plus pre- and post- judgement interest.

**PRAYER FOR RELIEF**

23. For damages in excess of $1,148,963.59, representing the unpaid principal balance due under the Security Agreement plus costs, interest accruing at a daily rate of $76.09, fees, and expenses;

24. For pre-judgment and post-judgment interest on the foregoing sums at the highest rate permitted by contract or law;

25. For an award of attorneys' fees and costs incurred in prosecuting this action;

26. For costs of suit; and

27. For such other and further relief as the Court deems just and proper.

**JURY DEMAND**

28. Pursuant to Federal Rule of Civil Procedure 38(b), E*TRADE hereby demands trial by jury of all issues properly triable thereby.

Dated: November 11, 2020                    GREENBERG TAURIG, LLP


By: /s/ *Scott L. Oliver*
Scott L. Oliver, Oregon SBN#181034
Kurt A. Kappes, *pro hac vice application forthcoming*
Lupe R. Laguna, *pro hac vice application forthcoming*
Attorneys for Plaintiff
.

**EXHIBIT A**



# E*TRADE Line of Credit and Security Agreement

**Notice to borrower:** This is a demand note and so may be collected by the Bank at any time. A new note mutually agreed upon and subsequently issued may carry a higher or lower rate of interest.

Line of Credit account number ▉▉▉▉▉▉▉▉▉▉

This **Line of Credit and Security Agreement** dated _____ Jun. 24 _____, 20 __20__ (as amended, supplemented, or otherwise modified from time to time, this "**Agreement**") is entered into by the following parties:

- A. Each Person, meaning an individual or trust, signing below as the Borrower (jointly and severally, "**Borrower**," "**you**" or "**your**");
- B. Each Borrower that is providing a lien and security interest in one or more Collateral Accounts (collectively, "**Pledgor**"); and
- C. E*TRADE Savings Bank as the lender (together with its successors and assigns, "**Bank**," "**we**," or "**us**")

By signing below, Borrower (either individually or through its authorized representative) agrees to be bound by the terms and conditions of this Agreement and the application for the Line of Credit (defined below) (the "**Line of Credit Application**"), which is hereby incorporated into this Agreement by reference (collectively with the Federal Reserve Form U-1 and any other documentation delivered by Bank to Borrower or executed by Borrower in connection with the Line of Credit, the "**Line of Credit Documentation**"). Borrower's representations, warranties, covenants, and certifications, as well as any disclosure by Bank, E*TRADE Securities LLC (the "**Securities Intermediary**"), and Borrower, in the Line of Credit Documentation are hereby incorporated herein by reference. Capitalized terms not otherwise defined herein shall have the meanings set forth in the Line of Credit Documentation.

### ① Effective Date

The Effective Date of this Agreement shall be the earlier of written notice from the Bank that the Line of Credit has been approved and is ready to use, or the Bank making a Credit Advance (the "**Effective Date**"). Until the occurrence of the Effective Date, this Agreement will be of no force or effect and nothing herein shall be deemed to constitute approval of your Line of Credit Application.

### ② Line of Credit

Bank's grant to Borrower of an uncommitted revolving line of credit account shall be subject to the terms and conditions of this Agreement (the "**Line of Credit**"). The Line of Credit is payable **on demand** to Bank. Advances are not extended for any specific term or duration, and Bank may, at its sole and absolute discretion, demand full or partial payment of all or a portion of the outstanding balance without cause at any time. Notwithstanding the foregoing, demand shall be deemed to have been made by Bank and the entirety of the outstanding balance shall be immediately due to Bank upon the commencement of proceedings under any bankruptcy or insolvency laws by or against Borrower or the appointment of a receiver for Borrower. The Line of Credit is secured by the collateral accounts held at Securities Intermediary and identified in **Exhibit A** attached hereto, as amended (the "**Collateral Accounts**"), and in the other "**Collateral**" (defined in Section 9A below). Each Borrower agrees that it shall be jointly and severally liable for the payment of any and all Obligations (defined in Section 5 below) to Bank as they become due, including upon demand by Bank. In the case of a Borrower which is a trust, a Trustee/Authorized representative of the Borrower shall also be liable for the aforementioned Obligations.

### ③ Credit Advances

a. Borrower may request a credit advance from the Line of Credit at any time (each, a "Credit Advance"), which Bank may honor at its sole discretion. Bank may provide Credit Advances by ACH credit to the deposit account designated by Borrower or in any other manner Bank agrees to from time to time, including but not limited to any wire transfer drawn against the Line of Credit. The minimum amount of the initial Credit Advance must be at least $1,000, or such higher amount as determined by Bank from time to time, and thereafter the minimum amount of each Credit Advance must be in increments of $1,000.

b. Prior to a demand for payment by Bank or termination of the Line of Credit, Bank may make Credit Advances at its sole discretion upon Borrower's request, and each of the following must be true and correct at the time of each such request:
  - i. Borrower has not breached any representation, warranty, covenant, or agreement under this Agreement;
  - ii. the Maintenance Requirement (defined in Section 8A below) is satisfied prior to the Credit Advance;
  - iii. Bank's security interest in the Collateral Accounts is not impaired, at the sole determination of Bank;
  - iv. the Collateral Accounts have not become subject to any attachment, garnishment, or other legal or tax process;
  - v. Borrower has not become the subject of a bankruptcy or similar proceeding;
  - vi. there has not been a material adverse change in Borrower's financial condition, as determined by Bank at its sole discretion;
  - vii. Borrower follows all instructions and requirements for requesting Credit Advances; and
  - viii. the aggregate Obligations do not, or will not after giving effect to the requested Credit Advance, exceed the Maintenance Requirement.

c. Borrower agrees that each request it makes for a Credit Advance shall serve as Borrower's certification to Bank of the conditions set forth above (except with respect to determinations at Bank's sole discretion). Borrower further agrees to promptly provide all documents and financial or other information in connection with any Credit Advance as Bank may request.

d. Bank may accept instructions for payments and Credit Advances in connection with your Line of Credit through the website identified by Bank in communications with Borrower, including any subdomains thereof (collectively, the "**Website**"), including, without limitation, payments, interest rate periods, and debit/credit entries, and such instructions will be deemed to have been given or made directly by Borrower. Instructions for Credit Advances may be requested at any time by Borrower over the Website, provided that the funds will be credited no sooner than the next Business Day (defined in Section 6B below).

### ④ Credit Limit

The credit limit for your Line of Credit, as determined by Bank from time to time, is the lesser of (a) the amount communicated by Bank to Borrower as the maximum amount of credit allowed under this Agreement or (b) the amount available under your Line of Credit at any given time based on Bank's discretion,



including its determination of the valuation and acceptability of the Collateral (the "**Credit Limit**"). Credit Advances may be obtained up to the Credit Limit, subject to Bank's sole discretion. If Bank makes a Credit Advance that exceeds the Credit Limit, this does not prevent Bank from demanding payment in whole or in part or from refusing to make additional Credit Advances, whether in excess of the Credit Limit or not.

### 5  Promise to Pay and Payment on Demand

Borrower promises and agrees to pay to Bank all Credit Advances plus all other liabilities and indebtedness incurred in connection with the Line of Credit, including all accrued and unpaid finance charges, any deficiency remaining in any Collateral Accounts in the event of the liquidation thereof, and all fees, costs (including collection costs and attorneys' fees), amounts due, expenses, and other charges hereunder or under any other Line of Credit Documentation (collectively, "**Obligations**") immediately **upon demand**.

All Obligations owing from Borrower to Bank under this Agreement shall become due and payable immediately upon Bank's demand; notwithstanding the foregoing, demand shall be deemed to have been made by Bank and payment of the Obligations shall be immediately due to Bank in full upon the commencement of proceedings under any bankruptcy or insolvency laws by or against Borrower or the appointment of a receiver for Borrower.  Bank may demand payment at any time of all or any part of the Obligations, and upon demand and without prior notice Bank may exercise its rights and remedies in connection therewith.

Bank will maintain in accordance with its usual practice an account or accounts evidencing the Obligations, including the amounts of principal and interest payable and paid to Bank from time to time hereunder.  The entries maintained in the accounts pursuant to this Section will be prima facie evidence of the existence and amounts of the Obligations therein recorded, provided, however, that the failure of Bank to maintain such accounts or any error therein shall not in any manner affect the obligation of Borrower to repay the Obligations in accordance with their terms.

### 6  Payments

a. Even if Bank has not demanded payment, Borrower agrees to make monthly payments of accrued and unpaid finance charges fourteen (14) calendar days after the date of the statement sent by Bank; and if such day is not a Business Day (as defined in Section 6B below), then on the next Business Day ("**Monthly Payments**") and upon demand.  Borrower may voluntarily repay any or all Credit Advances at any time without penalty or fee.

b. All payments on the Line of Credit shall be made in U.S. dollars in immediately available funds.  Any payment received by Bank on a day that is not a Business Day or after 5 p.m. Eastern Time on a Business Day will be deemed received on the following Business Day.  "**Business Day**" means any day other than a Saturday, a Sunday, or a day on which Bank is not open for business. All payments on the Line of Credit shall be applied first to any fees and charges due, then to billed interest due, then to reduce the total amount of outstanding Credit Advances, and then to unbilled accrued interest due (the "**Outstanding Balance**"), unless otherwise determined by Bank at its sole discretion.

c. If Bank does not receive a timely Monthly Payment, or the payment amount Bank receives is less than the amount of the Monthly Payment as set forth in your monthly statement, Borrower acknowledges and agrees that Bank may make a Credit Advance to pay such Monthly Payment from the Line of Credit in an amount that, together with any payment Bank receives from Borrower, is equal to the amount of such Monthly Payment.  Borrower understands that if Bank makes a Credit Advance to pay a Monthly Payment, the amount of such Credit Advance will increase the Outstanding Balance under Borrower's Line of Credit and such Credit Advances will thereafter bear additional interest charges at the applicable interest rates until the Credit Advances are paid in full.  Borrower acknowledges and understands that this may result in compounding of interest.

d. In some cases, Bank may receive a payment that satisfies Borrower's Outstanding Balance as of Borrower's most recent statement date ("**Final Payment**" or "**Payoff**"); however, an Outstanding Balance may remain if such Payoff has been made after the last statement date, as described in Section 6A above.  In such cases, fees, accrued interest, or any other charges might be incurred by Borrower, leaving a residual Outstanding Balance.  Borrower agrees that Bank may, at its discretion, collect payment for this remaining Outstanding Balance after a Final Payment has been made by Borrower.

e. In no event shall the total interest and other fees and charges imposed under this Agreement exceed the maximum amount permitted by applicable law, and any excess shall be refunded to Borrower or credited to the Outstanding Balance.

### 7  Variable Interest Rate and Method of Interest Computation

All Credit Advances will bear interest at a variable rate based on an index plus a margin.  The index is the greater of either (A) zero or (B) the LIBOR 1-Month Rate (USD) as published in the Wall Street Journal or other commercially available source providing quotations as set forth by Bank from time to time on each Monday morning that is a Business Day, or the next Business Day if Monday is not a Business Day, as adjusted or changed from time to time at Bank's sole discretion (the "**Index**"); provided, however, that Bank reserves the right, at its sole discretion, to select a replacement index to the LIBOR 1-Month Rate.  The margin is a percentage above the index and may be changed by Bank at its sole discretion upon notice of any such change and otherwise on such terms and conditions as may be required by applicable law or as stated in any notice (the "**Margin**").  Bank will calculate the interest charges for each billing period first by determining the interest charge for each day in the billing period and then by totaling the interest charges for all days in the billing period. The interest charge for each day in the billing period will be calculated by multiplying the daily balance for that day by the applicable interest rate in effect that day and then dividing the resulting amount by 360. The daily balance for each day is equal to the beginning Outstanding Balance for that day plus all new Credit Advances taken that day less any payments or credits that are applied to reduce the Outstanding Balance. Any amounts owing under this Agreement that are not paid when due may, at Bank's sole discretion, become a Credit Advance and will thereafter bear interest at the applicable rate until paid in full, which may result in compounding of interest. The billing period begins on the first day of each month and ends on the last day of each month.

### 8  Collateral Requirements

a. To comply with applicable law and ensure the adequacy and security of the Collateral, Bank may require that the Collateral Accounts contain a minimum value of Collateral to secure the Credit Advances (the "**Maintenance Requirement**").  Bank reserves the right, at its discretion, to require the deposit of additional Collateral in the Collateral Accounts and to set the Maintenance Requirement at a higher or lower amount with respect to particular assets, accounts, or classes of assets or accounts as Bank deems necessary, at its sole and absolute discretion.  Bank reserves the right to not accept any proposed Collateral, whether or not in the Collateral Account, and to require Borrower at any time to deposit in each or any Collateral Account substitute, new, or additional Collateral for any Collateral that has previously been deposited in such Collateral Accounts. In making these determinations, Bank may consider various factors, including but not limited to the value of the Collateral Account, the liquidity of a position, the investment rating, or concentrations of securities in a Collateral Account.

b. Pledgor agrees to maintain Collateral in the Collateral Accounts that has a value at least equal to the Maintenance Requirement. If Pledgor fails to satisfy the Maintenance Requirement or otherwise fails to meet a call for additional Collateral with respect to a Collateral Account, Bank, without limiting its right to do so at any time, may terminate the Line of Credit, demand payment of the Obligations, and liquidate some or all of the Collateral held by Pledgor in the Collateral Account.



c. Collateral is not permitted to become subject to any lock-up agreement or other agreement that affects the Collateral during the term of this Agreement. In respect to restricted and/or control stock, all appropriate Rule 144 paperwork will be kept up to date to include restricted and/or control stock held as Collateral, in the event that Bank liquidates and sells the Collateral, all Collateral consisting of securities will be readily transferable into "street name" in good deliverable form, and together with the securities of any other person whose sales must be aggregated under applicable laws and rules, will be saleable under the Securities Act of 1933 and other applicable laws and rules. Pledgor irrevocably authorizes and appoints Bank as collateral agent, to act as Pledgor's agent and attorney-in-fact to file or execute any documents or to execute documents in Pledgor's name, or take action or issue instructions regarding the Collateral as specified by this Agreement with or without designation of authority.

d. By including in **Exhibit A** one or more advisory accounts in a Wrap Fee Program sponsored or co-sponsored by E*TRADE Capital Management, LLC (respectively, "**Wrap Fee Program**", "**ETCM**", and each such Collateral Account, an "**Advisory Collateral Account**"), an investment adviser affiliated with Bank, Borrower and Pledgor acknowledge and agree that Bank's lien on an Advisory Collateral Account results in certain risks and, as a result of the fact that ETCM is an affiliate of Bank, creates an inherent conflict of interest with respect to the management of such Advisory Collateral Account. These risks and conflicts are discussed in this Agreement and in the current version of ETCM's Form ADV Part 2A–Appendix 1 Wrap Fee Programs Brochure ("**Brochure**"). Borrower/ Pledgor should refer to ETCM's Brochure and to Borrower/Pledgor's Managed Account Program Advisory Agreement ("**IAA**") with ETCM for the terms and conditions governing the provision of investment advisory services to the Advisory Collateral Account.

### 9  Lien

a. As security for the Obligations and the performance of Borrower's obligations hereunder (whether now or hereafter existing, due or to become due, direct or indirect, absolute or contingent, arising under, out of, or pursuant hereunder, or any Line of Credit Documentation), Pledgor hereby assigns, transfers, pledges, grants, and conveys to Bank a continuing, first priority lien and security interest in all of its right, title, and interest in the following, whether now owned or hereafter created, acquired, and/or arising: (i) the Collateral Accounts; (ii) any and all securities, securities entitlements, stocks, bonds, options, warrants, commodity contracts, futures contracts, notes, instruments, documents, general intangibles, commercial paper, money market funds and/or accounts, Treasury bills, notes and bonds, Certificates of Deposit, mutual fund shares, cash, money, investment property, and financial assets of any kind or type, whether certificated or uncertificated, now or hereafter contained in the Collateral Accounts, together with all rights, income, revenues, proceeds, and profits therefrom, including, without limitation, all dividends, distributions (cash or stock, extraordinary as well as ordinary), interest, and other payments, all additions thereto, substitutions or replacements thereof, and exchanges for or changes in any of the foregoing; (iii) any free credit balance or other money now or hereafter credited or owing to Pledgor on or with respect to the Collateral Accounts; (iv) all cash and non-cash proceeds of any of the foregoing; and (v) all rights incidental to the ownership of any of the foregoing, such as voting, conversion and registration rights, and rights of recovery for violations of applicable securities laws (collectively, the "**Collateral**"). Pledgor/Borrower will take all actions that Bank requests to ensure that Bank has a continuing perfected first priority lien and security interest in the Collateral, including, but not limited to, executing consents, assignments, and control agreements, in a form as Bank reasonably may require. Pledgor/Borrower acknowledges that Bank has ultimate control over all instructions made with respect to the Collateral Accounts; and if there is a conflict between the instructions Bank and Pledgor give with respect to the Collateral Accounts, Bank's instructions will prevail. In enforcing its lien and security interest against any of the Collateral, Bank shall have the sole discretion to determine which Collateral is to be liquidated. Pledgor/Borrower acknowledges and agrees that Bank may, without demand and to the extent permitted by applicable law, without advertisement, notice, hearing, or process of law, all of which Pledgor/Borrower hereby waives to the extent permitted by applicable law, at any time or times, sell or deliver any or all Collateral held by or for it at public or private sale, at any securities exchange or broker's board or at Bank's offices or elsewhere, for cash, upon credit or otherwise, at such prices and on such terms as Bank deems advisable at its discretion. Bank is not responsible for any decrease in the value of the financial assets in the Collateral Account or other Collateral occurring prior to or during liquidation. Bank has no duty to custody, safe-keep, or otherwise preserve any Collateral.

b. Pledgor irrevocably authorizes and appoints Bank to act as its agent and attorney-in-fact to file any documents or to execute any documents in its name, with or without designations of authority, to evidence, maintain, or perfect Bank's first priority security interest in, and to enable Bank to obtain control over, the Collateral. Pledgor acknowledges that (i) Bank may delegate this power and appointment to one or more parties to carry out the purposes stated in the preceding sentence, and (ii) it will be obligated with respect to such documentation as if it had executed the documentation itself.

c. Pledgor agrees that all principal, interest, dividends, distributions, premiums, or other income and payments received by Bank or credited to the Collateral Accounts with respect to any Collateral may be held by Bank as additional Collateral or applied by Bank to the Obligations. Bank may at any time and at its option transfer any securities or other investment property constituting Collateral to a securities or other account maintained in its name or cause any Collateral Account to be redesignated or renamed in the name of Bank. Bank may, from time to time and at its sole and absolute discretion, permit Pledgor to receive interest, dividend, or other payments from a Collateral Account.

d. Borrower agrees that Bank will have no responsibility to act on any notice of corporate actions or events provided to holders of securities or other investment property included in the Collateral or to preserve rights in the Collateral against prior parties. Borrower also agrees to (i) notify Bank promptly upon receipt of any communication to holders of the investment property disclosing or proposing any stock split, stock dividend, extraordinary cash dividend, spin-off, or other corporate action or event as a result of which Borrower would receive securities, cash (other than ordinary cash dividends), or other assets with respect to the investment property and (ii) immediately upon receipt by Borrower of any of these assets cause them to be credited to a Collateral Account or deliver them to or as directed by Bank as additional Collateral.

e. Pledgor authorizes the Bank to lend either to itself or to others any Collateral, other than Collateral held in an Advisory Collateral Account, to the fullest extent permitted by applicable law. Pledgor understands that, within the limitations imposed by applicable law, the Bank may use all such Collateral, including without limitation by borrowing, lending, rehypothecating or pledging the Collateral, with all the attendant rights of ownership (including the right to vote the securities), for the sum due to the Bank, or for a greater sum and for a period of time longer than the obligations to which such Collateral was pledged by Pledgor, and without the Bank retaining in its possession and control a like amount of similar Collateral. In the event that the Bank borrows, pledges, repledges, hypothecates or rehypothecates any such Collateral, the Bank may receive and retain certain benefits to which Pledgor will not be entitled. Any dividend, interest payment or other distribution paid in respect of such Collateral will be a payment in lieu of the distribution (also known as a "substitute payment") and credited to the Collateral Account. Payments in lieu of dividends are reported as ordinary income, which would cause a holder with taxable accounts to lose the benefit of preferential tax rates on qualified dividend income under U.S. tax laws. Pledgor understands that neither the Bank nor the Securities Intermediary offer tax advice and that Pledgor should consult with Pledgor's tax advisor as necessary. In certain circumstances, Pledgor may not be able to exercise voting rights of the Collateral which have been pledged, repledged, borrowed, hypothecated or rehypothecated by the Bank. Pledgor understands that with respect to any Collateral borrowed, pledged, repledged, hypothecated or rehypothecated by the Bank, the obligation to return such Collateral to Pledgor will be an obligation of the Bank and not Securities Intermediary. For the purposes of the return of any Collateral to the Collateral Account, the Bank's return obligations shall be satisfied by delivering Collateral of the same issuer, class and quantity as the Collateral initially transferred. Any such pledge, repledge, hypothecation or rehypothecation of any Collateral can occur without Pledgor being notified, either separately or together with Collateral of other clients of the Bank. Notwithstanding the foregoing, Bank shall not, and shall have no authority to, borrow, rehypothecate or pledge, or lend either to itself or to others, any Collateral held in an Advisory Collateral Account.



**10 Control Agreement**

Bank and Pledgor hereby intend that this Agreement shall establish "control" of the Collateral Account by the Bank for purposes of perfecting Bank's security interest in the Collateral Account. For the purpose of giving Bank control over the Collateral Account and in order to perfect Bank's Lien on the Collateral, Pledgor hereby authorizes and consents to compliance by Securities Intermediary with entitlement orders and instructions from Bank regarding the Collateral Account, including disposition of the Collateral within any Advisory Collateral Account, without providing notice to, or obtaining the further consent of, Pledgor. Without limiting the foregoing, Pledgor acknowledges, consents and agrees that, pursuant to a control agreement entered into between Bank and Securities Intermediary:

a. In order to enable Pledgor to trade property that is from time-to-time credited to the Collateral Account, Securities Intermediary may rely upon the entitlement orders originated by the Pledgor (or its assigns) regarding the Collateral Account, but only until the time that Bank notifies the Securities Intermediary that Bank is asserting exclusive control over the Collateral Account. After Securities Intermediary has received notice of exclusive control from Bank, it will no longer comply with entitlement orders originated from Pledgor (or assigns) concerning the Collateral Account.

b. The Parties acknowledge that Securities Intermediary is an intended third-party beneficiary of this Section and shall be entitled to rely on it to such degree and with the same force and effect as if Securities Intermediary were a party to this Line of Credit and Security Agreement.

**11 Right of Setoff**

In addition to Bank's security interest in the Collateral Accounts, Borrower agrees that Bank will at all times have a right to set off any or all of the Obligations against all securities, cash, deposits, or other property in the possession of or at any time in any account maintained with Bank by or for the benefit of Borrower, whether owned by Borrower individually or jointly with others. This right of setoff is in addition to, and not in limitation of, any right Bank may have at law or otherwise. In the case of a Borrower which is a trust, the above right of set off shall extend to the Trustee/Authorized representative of the Borrower.

**12 Representations, Warranties, Covenants and Acknowledgements**

Borrower continuously represents, warrants, and covenants to Bank (and, for Borrowers whose Collateral is held within a Collateral Advisory Account with respect to Sections 12m – 12u below, acknowledges, and represents and war- rants that Borrower understands) the following:

a. Pledgor owns the Collateral Accounts and/or Collateral Advisory Accounts free of any lien or security interest (other than the lien and security interest established under this Agreement and any lien and security interest permitted by Bank in writing in favor of the applicable Securities Intermediary) and will not pledge the Collateral Accounts to any third party without the prior written consent of Bank.

b. This Agreement constitutes the legal, valid, and binding obligations of Borrower, fully enforceable according to its terms, and is effective to create a valid and continuing first priority lien and security interest in the Collateral Accounts.

c. Borrower has all power and authority to execute and deliver this Agreement and to perform its obligations under this Agreement, and the performance and consummation of the transactions under this Agreement have been authorized by all necessary action on the part of Borrower and do not and will not violate any applicable law, contract, or agreement (including any organizational/foundational documents and bylaws) to which Borrower is subject.

d. Borrower has obtained any spousal or other consents that may be required by applicable law.

e. Borrower has paid and will pay promptly when due all taxes imposed on Borrower and has complied and will comply with all applicable laws, rules, regulations, and ordinances.

f. Borrower will provide Bank with updated financial information and such additional documents or filings as may be requested from time to time to effectuate the purposes of this Agreement.

g. Borrower will provide Bank with prompt written notice of any change in name, address, or employment, as applicable.

h. Borrower (i) is not a "blocked" person listed in the Annex to Executive Order Nos. 124947, 13099, and 13224 and all modifications thereto or thereof and (ii) is in full compliance with the requirements of the USA PATRIOT Act of 2001, 107 Public Law 56 (October 26, 2001), and other statutes and all orders, rules, and regulations of the United States government and its various executive departments, agencies, and offices related to the subject matter of the USA PATRIOT Act of 2001, including Executive Order No. 13224 effective September 24, 2001, and all other requirements contained in the rules and regulations of the Office of Foreign Assets Control, Department of the Treasury.

i. There are no pending or threatened suits or legal actions that could have a material adverse effect on Borrower's financial condition.

j. No Borrower is in default under any material contract, judgment, decree, or order to which it is a party or by which it or its properties are bound.

k. Borrower has duly filed all tax and information returns required to be filed and has paid all taxes, fees, assessments, and other governmental charges or levies that have become due and payable, except to the extent such taxes or other charges are being contested in good faith and are adequately reserved against in accordance with generally accepted accounting principles consistently applied.

l. All the information requested in the Line of Credit Application and supplied by Borrower, or subsequently provided by Borrower, is true and accurate, and Borrower agrees to promptly notify Bank in writing of any material adverse changes to any or all of the information contained in the Line of Credit Application or otherwise, including information relating to Borrower's financial situation. Borrower agrees to provide updated financial or other information to Bank as may be requested from time to time and agrees to execute and deliver to Bank such additional or supplemental documents as it reasonably deems necessary or appropriate to effectuate this Agreement.

Sections m-u below apply to Borrowers whose Collateral is held within an Advisory Collateral Account.

m. There are adverse effects of pledging an Advisory Collateral Account as Collateral, including, but not limited to, the fact that Bank may at any time require additional Collateral. If the Borrower fails to deposit sufficient cash or other eligible asset into the relevant Advisory Collateral Account in a timely manner in response to a collateral call, the Bank has the right to take control of such Advisory Collateral Account in accordance with the terms of the Control section of this Agreement. In addition, the Bank can enforce a liquidation of any Collateral, and can do so without contacting Pledgor. Such liquidation may result in Pledgor being subject to additional fees and expenses, including commissions for securities transactions in the Advisory Collateral Account. For the avoidance of doubt, pledged Advisory Collateral Accounts will remain subject to all applicable fees and expenses associated with the advisory program in which the Advisory Collateral Account is invested. The IAA with ETCM, and the Collateral Account's participation in the Wrap Fee Program, will terminate prior to the Bank taking control of the Advisory Collateral Account, and the Collateral Account will convert to a brokerage account, which is subject to the terms of the E*TRADE Customer Agreement as well as the Line of Credit Documentation.

n. None of Bank, ETCM, any of their affiliates, any co-Sponsor of a Wrap Fee Program, and any ETCM Investment Adviser Representative ("IAR") will provide advice on or oversee Borrower/Pledgor's Line of Credit.

o. A collateral call would, if not addressed in a timely manner, terminate the provision of investment advisory services to an Advisory Collateral Account, which could cause a diminution of the value of such Collateral Account and a decline in such Collateral Account's performance.

**E✱TRADE**®

p.  In the event that Bank takes control of an Advisory Collateral Account, the relevant IAA shall be deemed to have terminated, and ETCM shall no longer provide any investment advisory services, or charge any fees for such services, to such Advisory Collateral Account following such termination.

q.  If an Advisory Collateral Account is converted to a brokerage account due to the Bank taking control of the Advisory Collateral Account, Borrower/Pledgor generally will not be: (1) provided with prior notice of a liquidation or transfer of the securities in such Collateral Account; or (2) entitled to choose the securities which are to be liquidated or transferred by Bank, and acknowledges that the liquidation of securities may result in tax consequences.

r.  Bank has the right to protect its own commercial interests and may take actions that adversely affect Borrower/Pledgor, including by taking control of an Advisory Collateral Account and thereby causing the conversion of the Advisory Collateral Account into a brokerage account, and subsequently selling or transferring, or causing the sale or transfer of, securities in such Collateral Account on behalf of Borrower/Pledgor or foreclosing and liquidating such securities in Bank's own name.

s.  The costs associated with the Line of Credit are not included in the advisory fees applicable to Wrap Fee Programs and will result in additional compensation to Bank and its affiliates. This additional compensation will result in a conflict of interest between ETCM and its clients and in conflicting incentives in the management of Advisory Collateral Accounts. In addition, Bank's lien also creates conflicts of interest with respect to the management of Advisory Collateral Account as a result of ETCM's affiliation with Bank. For example, because of such a lien, ETCM has an incentive to favor Advisory Collateral Accounts over other accounts in the Wrap Fee Programs (e.g., for investment or trade allocations or the valuation of positions in the account), and to prefer more conservative investment choices than may otherwise be appropriate for a particular Advisory Collateral Account, in order to minimize the risk of loss with respect to Bank's collateral. ETCM addresses these conflicts of interest through disclosure in the Line of Credit Documentation and ETCM's Brochure and through policies and procedures reasonably designed to ensure that the management of an advisory account is not affected by its being designated an Advisory Collateral Account.

t.  Borrower/Pledgor has read and understood the terms, conditions and risk disclosures in the Line of Credit Documentation and otherwise applicable to any Advisory Collateral Account, including the relevant disclosures in the current version of ETCM's Brochure, and understands that such risks may be heightened in the event an Advisory Collateral Account holds a concentrated position or makes up all, or substantially all, of the Borrower/Pledgor's overall net worth or investible assets.

u.  In the event that an IAA is terminated other than as a result of the Bank taking control of the Advisory Collateral Account, the party terminating the IAA shall promptly notify Bank of such termination and the Advisory Collateral Account shall immediately cease being an Advisory Collateral Account and shall become a non-managed retail account which shall be treated as a Collateral Account for all purposes under the Line of Credit Documentation.

The provisions of this Section will survive the termination of this Agreement and the Line of Credit Documentation.

### 13  Indemnification

Without the necessity of a judicial determination, and whether or not litigation occurs, Borrower agrees to defend, indemnify, and hold harmless Bank, Securities Intermediary, Bank's other affiliates and their respective directors, officers, employees, agents (each, an "Indemnified Party"), from any and all claims, liabilities, judgments, damages, losses, costs, and expenses of any nature whatsoever (including reasonable attorneys' fees and expenses) (collectively, "Losses") in any way related to, arising out of, or in connection with, directly or indirectly, this Agreement, the Line of Credit, the Line of Credit Documentation, or the transactions contemplated hereby, including without limitation the grant by Pledgor of a first priority lien and security interest in the Collateral Accounts and any action taken or omitted by Bank at the request of Borrower or pursuant to instructions provided by Borrower, except to the extent such Losses are determined by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct. Borrower further agrees that in no event will any Indemnified Party be liable to Borrower for any special, indirect, incidental, consequential, or punitive damages arising out of or otherwise relating to this Agreement, the Line of Credit, any document or instrument delivered in connection herewith, or the transactions contemplated hereby, including any Credit Advance. No provision of this Agreement or in any other document executed in connection with the Line of Credit and no course of dealing among the parties hereto will be deemed to create any fiduciary duty by or of Bank to Borrower.

The provisions of this Section will survive the termination of this Agreement and the Line of Credit Documentation.

### 14  Line of Credit Servicing

Borrower may elect to make Monthly Payments on Borrower's Line of Credit by (a) ACH debit from Borrower's designated deposit account; (b) check, subject to a $10 processing fee and a $25 returned-check fee, when applicable; or (c) Credit Advances against Borrower's Line of Credit, which may result in compounding of interest. Borrower should elect the payment method via the Website before the first Monthly Payment on the Line of Credit is due. Please note that it may take several days to set up the initial ACH debit once we receive Borrower's authorization. If Borrower fails to timely select a payment method, the default payment method will be payment by Credit Advance as described in Section 5 above. Borrower acknowledges and agrees that Bank may share any and all information regarding Borrower and Borrower's accounts at Bank with Securities Intermediary and any of Bank's agents or third-party service providers as is necessary or advisable to originate, effect, administer, or enforce, or to service, process, or maintain, any transaction, loan, or accounts contemplated by the Line of Credit Documentation. Securities Intermediary may provide to Bank copies of all statements and confirmations concerning the Collateral Account and any other account at such times and in such manner as Bank may request and may share with Bank any and all information regarding each Borrower and each Borrower's accounts.

### 15  Restrictions on Use of Line of Credit

Borrower will not allow any Credit Advances to be used, directly or indirectly, (a) to purchase, carry, or trade any "margin stock," as defined under Regulation U issued by the Board of Governors of the Federal Reserve, or to extend credit to others for the purpose of purchasing, carrying, or trading any margin stock, (b) to repay or retire indebtedness incurred to purchase, carry, or trade any margin stock, (c) in connection with any illegal transaction, or (d) to repay any debt to Bank or any affiliate of Bank. Borrower is not engaged principally, or as one of its important activities, in the business of extending credit for the purpose, whether immediate, incidental, or ultimate, of buying, carrying, or trading margin stock.

### 16  Credit Investigation, Negative Credit Report and Information Sharing

Borrower authorizes Bank or anyone authorized by Bank to obtain such credit and other reports as Bank deems necessary or advisable from time to time without notice to verify the accuracy of the information herein, to determine the creditworthiness of Borrower, or for normal account maintenance. Borrower further authorizes Bank to share credit information about the Line of Credit with its affiliates, including, without limitation, Securities Intermediary, any third-party service providers that may assist with administering and collecting on the Line of Credit, and others, such as a credit reporting agency or collection agency. By listing an Advisory Collateral Account on **Exhibit A**, Borrower authorizes and consents to ETCM, Bank, and/or Securities Intermediary sharing Borrower's personal information (including, without limitation, name, physical and email address, social security number, date of birth, occupation, credit report, bank account information, and list of securities being pledged as collateral) among themselves and with their affiliates as needed in connection with offering, extending, and providing services relating to, the Line of Credit to such Borrower. Bank may report information about the Line of Credit to credit bureaus. Late payments, missed payments, or other defaults on your Line of Credit may be reflected in your credit report. Subject to any applicable laws and regulations, information and data regarding Borrower and Borrower's accounts may be shared with affiliates of Bank; and each Borrower requests that Bank share such

ESB_005



personal financial data with parties who are not affiliates of Bank to the extent necessary or advisable to effect, administer, or enforce, or to service, process, or maintain, any transactions and accounts contemplated by the Line of Credit Documentation.

### 17  Communications

Communications and notices related to this Agreement may be sent to Borrower (a) through the Website, (b) at the address designated in the Line of Credit Application or at such other address as Borrower may hereafter give Bank in writing, or (c) via email at your registered email address, and all such communications and notices, whether posted on the Website or sent by email, mail, facsimile, messenger, or otherwise, will be deemed given to Borrower personally, whether actually received or not, and will be effective at the time posted or sent. Borrower acknowledges that Borrower has sole access to its registered email address and its Line of Credit account and that communications from Bank may contain sensitive, confidential, and collections-related communications. If Borrower changes its registered email address, residence address, or telephone number, Borrower must immediately notify E*TRADE by contacting Borrower's financial professional or by calling Customer Service at 1-800-ETRADE-1 (1-800-387-2331).

### 18  Disclaimer

Borrower acknowledges that, notwithstanding the fact that ETCM, an affiliate of Bank, will act as Borrower's investment adviser with respect to each Advisory Collateral Account, Bank or its affiliates have not provided and will not provide Borrower with any investment, legal, tax, or accounting advice; that Bank's employees are not authorized to give any such advice; and that Borrower will not solicit or rely on any such advice from Bank or its employees whether in connection with this Agreement, any other documentation, the Line of Credit, the Collateral Accounts, or otherwise. In making investment, legal, tax, or accounting decisions with respect to entering into, maintaining the Line of Credit or any other matter relating to the Line of Credit, Borrower had the opportunity to consult with or has consulted with and will rely on its own advisers and neither Bank or ETCM, and neither Bank nor ETCM will have liability therefor. Furthermore, Bank may take any steps necessary to perfect its security interest in the Collateral, issue a call for additional collateral, or force the sale of any pledged securities if any Borrower's actions or inactions call Borrower's creditworthiness into question. In taking such steps, Bank will not act as Borrower's investment adviser with respect to any liquidation and, in fact, Bank will act as a creditor.

Borrower acknowledges and understands that Bank, at its sole and absolute discretion, may compensate Securities Intermediary in connection with its efforts to originate, effect, administer, or enforce, or to service, process, or maintain, any transaction, loan, or accounts contemplated by the Line of Credit Documentation and that Securities Intermediary, at its sole and absolute discretion, may compensate its employees in connection with the origination of the Line of Credit. Any such compensation may be based in whole or in part on the amount of the Line of Credit or the outstanding balance at any time under the Line of Credit.

### 19  Identity Verification

To help the U.S. government fight the funding of terrorism and money laundering activities, federal law requires all U.S. financial institutions to obtain, verify, and record information that identifies each person who opens an account. When Borrower applies for the Line of Credit, Bank will ask for Borrower's name, address, and other information that will allow Bank to identify each Borrower. Bank may also ask to see other identifying documents. Bank is firmly committed to compliance with all applicable laws, rules, and regulations, including those related to combating money laundering. Borrower understands and agrees that Borrower must take all necessary steps to comply with the anti−money laundering laws, rules, and regulations of its country of origin, country of residence, and the situs of its transaction.

### 20  Recording Conversations

Borrower acknowledges, understands, and hereby consents to Bank's electronically recording any telephone conversations between Borrower and Bank.

### 21  Deduction or Withholding for Tax

All payments required under this Agreement, including but not limited to Monthly Payments and payments upon Bank's demand, will be made free and clear and without any deduction or setoff for any taxes, levies, withholds, or liabilities. If Borrower is required to deduct any taxes in connection with any amount payable under this Agreement, Borrower will pay the required taxes and increase the payment to Bank in the amount necessary to preserve the after-tax yield that Bank would have received had such taxes not been imposed. Upon Bank's request, Borrower will promptly provide satisfactory evidence of the payment of any taxes with respect to this Agreement.

### 22  Termination

This Agreement will terminate (a) upon transmittal of a written request from Borrower to Bank and Bank's written acceptance of such request, including through the Website, or (b) at Bank's sole discretion upon notice to Borrower; provided, however, that Bank may take such action immediately and without notice to the Borrower in the event that Borrower is in breach of this Agreement, including with respect to Section 12. Bank will not honor a request to terminate this Agreement unless and until all Obligations have been paid and satisfied in full, and any request for termination that is granted by Bank prior to the satisfaction and payment in full of the Obligations shall automatically be deemed to be expressly conditioned upon the payment and satisfaction in full of all such Obligations by Borrower.

### 23  Joint and Several Liability

If more than one Person is applying as a Borrower (each Person, a "Co-Borrower"), each such Person confirms their intention to apply for joint credit by signing this Agreement and the Line of Credit Application as Co-Borrower. The obligations and liabilities of each Borrower under this Agreement shall be joint and several, regardless of any divorce, separation, or other legal proceedings, or any agreement to the contrary, unless expressly agreed to in writing by Bank or prohibited by applicable law. Each Borrower is fully responsible for all credit extended pursuant to the Line of Credit. Each Borrower may request Credit Advances to the extent allowed by this Agreement. Each Borrower may request that Bank cease making Credit Advances by sending Bank a written notice to that effect (a "**Suspension Request**"). Upon Bank's written acceptance of a Suspension Request, Bank shall have no obligation to make any additional Credit Advances but shall be entitled to convert into a Credit Advance any interest and other fees and charges due under this Agreement that are not paid at the end of a billing period. Bank's acceptance of a Suspension Request shall not release or otherwise affect Bank's security interest in the Collateral Accounts or any other right or remedy of Bank against any Borrower hereunder. At its sole discretion, Bank may reinstate Credit Advance privileges under the Line of Credit following a Suspension Request if each and every Borrower has consented to the same in writing in a form acceptable to Bank.

### 24  Joint Account

If there is more than one Borrower, the legal ownership of the Line of Credit will be as designated on the Line of Credit Application.

Each Borrower authorizes Bank to follow the instructions of any Borrower concerning any matter pertaining to the Line of Credit. This includes any repayment or disbursement credited to or debited from the Line of Credit. Bank is not responsible for determining the purpose or propriety of any instruction received from any Borrower as against any other Borrower. At its sole discretion, Bank reserves the right to require written instructions from one or all Borrowers. If Bank receives instructions from any Borrower that, in Bank's opinion, conflict with instructions received from any other Borrower, Bank may, but is not obligated to, comply with any of these instructions or advise each Borrower of the apparent conflict and take no action as to any of these instructions until it actually receives and has a reasonable amount of time to act on satisfactory instructions from any or all of the Borrowers, but it is not obligated to do so



at its own discretion. In the event of a dispute between or among Borrowers of which Bank has notice, Bank reserves the right, but is not obligated, to place restrictions on a Line of Credit. For example, if a Borrower requests that a restriction be placed on access to funds in the Line of Credit because of a pending divorce, litigation, or dispute between Borrowers, Bank may prohibit all transfers of funds from the Line of Credit, with such restrictions to remain in place until Bank actually receives and has a reasonable amount of time to act on appropriate court documentation or a written, notarized instruction signed by all Borrowers. In such a case, all Borrowers remain liable for any pending disbursements that have not yet cleared at the time of the restriction. Bank also may, at the expense of Borrowers, commence or defend any action or proceeding for or in the nature of interpleader to have the dispute resolved judicially.

Each Borrower agrees that, on the death or disability of a Borrower, a divorce of married Borrowers, or any other event that causes a change in ownership or capacity with respect to the Line of Credit, the remaining Borrower(s) will immediately give Bank official written notice of such change of ownership or capacity. Bank will not be responsible for any transfers, payments, or other transactions in the Line of Credit made at the direction of a former Borrower or incapacitated Borrower before Bank actually received and had a reasonable amount of time to act on such official written notice. Following receipt of such official written notice, Bank may require additional documents and reserves the right to retain such assets in and/or restrict transactions in the Line of Credit as it deems advisable at its sole discretion to protect Bank against any Losses. Any former Borrower and the estate of any deceased or incapacitated Borrower will remain jointly and severally liable to Bank for any Losses in the Line of Credit arising out of or relating to transactions initiated before Bank actually received and had a reasonable amount of time to act on such official written notice.

Bank will not notify other Borrowers of the actions taken by any one Borrower. Each Borrower agrees that notice provided to any one Borrower will be deemed to be notice to all Borrowers for all purposes.

### 25. Severability

If any provision or condition of this Agreement shall be held to be invalid or unenforceable by any court, regulator, or self-regulatory agency or body, such invalidity or unenforceability shall attach only to such provision or condition. This includes any provision prohibited by the Military Lending Act for Borrowers subject to the protections of that Act. The validity of the remaining provisions and conditions shall not be affected thereby, and this Agreement shall be carried out as if any such invalid or unenforceable provision or condition were not contained herein.

### 26. Conflicts

In the event of a direct conflict between the terms of this Agreement and the Line of Credit Application, and any other Line of Credit Documentation, the terms of this Agreement shall control.

### 27. Assignment

Borrower agrees that, Bank may assign the Line of Credit and/or any rights that Bank has under this Agreement and Line of Credit Documentation, including but not limited to the right to collect any Obligations owing from Borrower, to a third party without Borrower's consent. This Agreement shall inure to the benefit of Bank's successors and assigns, whether by sale, merger, consolidation, or otherwise. Neither Borrower nor Pledgor may assign any of its rights or obligations under this Agreement.

### 28. Acceptance of Application and Agreement and Applicable Law

a. THE LINE OF CREDIT APPLICATION, THIS AGREEMENT, AND THE OTHER LINE OF CREDIT DOCUMENTATION WILL BE RECEIVED AND ACCEPTED BY BANK IN THE STATE OF VIRGINIA. IF THE LINE OF CREDIT APPLICATION AND THIS AGREEMENT ARE DELIVERED TO BANK, THEY WILL BE RECEIVED AND ACCEPTED BY BANK IN THE STATE OF VIRGINIA WHEN ACTUALLY RECEIVED BY BANK. DELIVERY OF THE LINE OF CREDIT APPLICATION AND THIS AGREEMENT TO BORROWER'S FINANCIAL PROFESSIONAL OR TO SECURITIES INTERMEDIARY WILL NOT BE CONSIDERED RECEIPT OR ACCEPTANCE BY BANK. ALL DECISIONS MADE BY BANK REGARDING THE LINE OF CREDIT WILL BE MADE IN VIRGINIA.

b. THE LINE OF CREDIT APPLICATION AND THIS AGREEMENT WILL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

### 29. Amendment and Oral Agreements

This Agreement and the Line of Credit Documentation may be altered or amended by Bank, including but not limited to the addition or deletion of any provision of this Agreement. This Agreement may not be amended orally. Bank may waive compliance with any provision of this Agreement at its sole and absolute discretion, but any waiver must be in writing and will not be deemed to be a waiver of any other provision of this Agreement. The provisions of this Agreement and the Line of Credit Documentation constitute the full and entire agreement between Bank and Borrower with respect to the subject matter hereof and supersede all prior or contemporaneous agreements, proposals, understandings, and representations, written or oral, between the parties with respect to the subject matter hereof.

### 30. No Waiver

This Agreement cannot be modified by conduct, and no failure on the part of Bank at any time to enforce its rights hereunder to the greatest extent permitted shall in any way be deemed to waive, modify, or limit the rights granted Bank hereunder, including those rights vested in Bank with respect to the Collateral Accounts.

### 31. Extraordinary Events

Bank shall not be liable to Borrower for losses caused directly or indirectly by government restrictions, exchange or market rulings, suspension of trading, war, strikes, or other conditions beyond Bank's control.

### 32. Arbitration

IT IS IMPORTANT THAT YOU READ THIS ARBITRATION CLAUSE. IT PROVIDES THAT YOU MAY BE REQUIRED TO RESOLVE ANY CLAIM OR DISPUTE THROUGH ARBITRATION, EVEN IF YOU WOULD PREFER TO LITIGATE THE CLAIM IN COURT. YOU ARE GIVING UP THE RIGHTS YOU MIGHT HAVE TO LITIGATE SUCH CLAIMS BEFORE A JURY. OTHER RIGHTS THAT YOU WOULD HAVE IF YOU WENT TO COURT, SUCH AS DISCOVERY OR THE RIGHT TO APPEAL THE DECISION, MAY NOT BE AVAILABLE IN ARBITRATION OR MAY BE MORE LIMITED. YOU SHOULD CONSULT LEGAL COUNSEL TO DETERMINE WHETHER THIS ARBITRATION CLAUSE IS APPROPRIATE FOR YOU. IF YOU ARE A "COVERED BORROWER" AS DEFINED IN THE MILITARY LENDING ACT, WHICH INCLUDES ELIGIBLE ACTIVE DUTY MEMBERS OF THE ARMED FORCES OR THEIR DEPENDENTS, THEN THIS ARBITRATION CLAUSE IS NOT APPLICABLE TO YOU.

All disputes, claims, or controversies between you and Bank regarding your account or any account-related services, except claims subject to the jurisdiction of the small claims court (or your state's equivalent court), shall be resolved by binding arbitration at the election of either party. This applies to all disputes arising under case law, statutory law, and all other laws, including but not limited to all contract, tort, and property disputes; disputes arising out of or relating to your relationship with Bank, your account with Bank, or any service provided by Bank in connection with your account; and all such disputes between you and Bank's officers, employees, agents, or affiliates.



The arbitration shall be conducted according to the rules then in effect of the American Arbitration Association. The web address of the American Arbitration Association is adr.org, and the telephone number is 1-800-778-7879. The matter shall be heard by one arbitrator unless the amount in controversy exceeds $75,000, in which event three arbitrators shall hear the case. A submission to a single arbitrator will be deemed a waiver of any right to recover more than $75,000. This arbitration agreement concerns transaction in interstate commerce and shall be governed exclusively by the Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq*. The award of the arbitrators or of the majority of the arbitrators will be final and binding, and judgment on such award may be entered in any court having jurisdiction. This arbitration agreement shall be binding on each party's heirs, administrators, representatives, executors, successors, assigns, and all other persons claiming a legal or beneficial interest in your account. Any costs, attorneys' fees, or taxes involved in confirming or enforcing the award will be fully assessed against and paid by the party resisting confirmation or enforcement of the award.

Except as otherwise required by law, (a) you may not assert claims on behalf of others in an arbitration proceeding (e.g., in a representative or private attorney general capacity), and (b) the arbitrator shall not have the authority to award relief for or against anyone on a class or representative basis.

The parties agree and understand that the arbitrator shall have all the powers provided by law and the rules of the arbitration forum. Those powers shall include all legal and equitable remedies, including but not limited to monetary damages, declaratory relief, and injunctive relief available under applicable law. The institution and maintenance of any action for judicial relief in a court to obtain a monetary judgment or enforcement shall not constitute a waiver of the right of any party to compel arbitration regarding any dispute or remedy subject to arbitration.

If you initiate arbitration, Bank will pay one half of any arbitration filing fee. You will pay the rest of the filing fee and all the arbitration fees charged by the arbitration forum and the arbitrator through the first day of the arbitration, up to a maximum of eight hours. Bank and you will split any remaining fees. The arbitrator(s) shall have the power to assess in the award all or part of the filing fees and arbitration fees to either party. If you believe the cost of arbitration may be too burdensome, you may contact the arbitration forum to seek a waiver; if that is not successful, you may contact Bank and request that Bank pay a greater share of the arbitration fee. If the laws of the state in which you are a resident require E*TRADE Savings Bank to pay all forum fees, E*TRADE will pay those fees.

If you reside outside the United States at the time of arbitration, you agree that the arbitration will be held in Arlington, Virginia. You consent to the personal jurisdiction of the courts of the Commonwealth of Virginia, USA, for all purposes relating to this arbitration agreement, and you agree that the arbitration shall be conducted in the English language.

If any part of this arbitration clause is determined to be void or unenforceable for any reason, the remainder of this arbitration clause shall remain in effect to the maximum extent possible and the void or unenforceable part shall be severed from the rest of the agreement. Any dispute as to the validity of this arbitration clause, however, including the waiver of rights to participate in any class action, shall be determined by a court of competent jurisdiction. In the event that the class action (or similar representative action) waiver in this arbitration clause is deemed invalid, the entire arbitration clause shall be null and void.

This section will not be deemed to limit or constrain our right of setoff, to obtain provisional or ancillary remedies, to interplead funds in the event of a dispute, to exercise any security interest or lien we may hold in property, or to comply with legal process involving your accounts or other property.

### 33 State Law Disclosures

**California and New York Residents.** We may report information about your account to credit bureaus. Late payments, missed payments, and other defaults on your account may be included in your credit report.

**Connecticut Residents. Applicable to Borrowers entering into non-consumer purpose transactions only.** Borrower expressly acknowledges that the Line of Credit and Security Agreement and each transaction related to it is a "commercial transaction" within the meaning of Chapter 903a of the Connecticut General Statutes, as amended. Borrower hereby voluntarily and knowingly waives any and all rights that are or may be conferred upon it under Chapter 903a of said statutes (or any other federal or state law affecting prejudgment remedies) to any notice or hearing or prior court order or the posting of a bond prior to Bank's obtaining a prejudgment remedy. Borrower acknowledges that it has counsel of its choice with respect to this transaction and the Line of Credit and Security Agreement.

**Missouri Residents.** Notice Provided Under Section 432.045 R.S. Mo.: ORAL AGREEMENTS OR COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT, INCLUDING PROMISES TO EXTEND OR RENEW SUCH DEBT, ARE NOT ENFORCEABLE. TO PROTECT YOU (BORROWER(S)) AND US (CREDITOR) FROM MISUNDERSTANDING OR DISAPPOINTMENT, ANY AGREEMENTS WE REACH COVERING SUCH MATTERS ARE CONTAINED IN THIS WRITING, WHICH IS THE COMPLETE AND EXCLUSIVE STATEMENT OF THE AGREEMENT BETWEEN US, EXCEPT AS WE MAY LATER AGREE IN WRITING TO MODIFY IT.

Notice Provided Under Section 432.047 R.S. Mo.: ORAL OR UNEXECUTED AGREEMENTS OR COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT, INCLUDING PROMISES TO EXTEND OR RENEW SUCH DEBT, ARE NOT ENFORCEABLE, REGARDLESS OF THE LEGAL THEORY UPON WHICH IT IS BASED THAT IS IN ANY WAY RELATED TO THE CREDIT AGREEMENT. TO PROTECT YOU (BORROWER(S)) AND US (CREDITOR) FROM MISUNDERSTANDING OR DISAPPOINTMENT, ANY AGREEMENTS WE REACH COVERING SUCH MATTERS ARE CONTAINED IN THIS WRITING, WHICH IS THE COMPLETE AND EXCLUSIVE STATEMENT OF THE AGREEMENT BETWEEN US, EXCEPT AS WE MAY LATER AGREE IN WRITING TO MODIFY IT.

**Maine, New York, and Vermont Residents.** A consumer credit report may be requested in connection with this application or in connection with updates, renewals, or extensions of any credit granted as a result of this application. Upon your request, you will be informed whether or not such a report was requested and, if so, the name and address of the agency that furnished the report.

**Ohio Residents.** The Ohio laws against discrimination require that all creditors make credit equally available to all creditworthy customers and that credit reporting agencies maintain separate credit histories on each individual on request. The Ohio Civil Rights Commission administers compliance with this law.

**Oregon Residents.** Under Oregon law, most agreements, promises, and commitments made by us concerning loans and other credit extensions that are not for personal, family, or household purposes or secured solely by the Borrower's residence must be in writing, express consideration, and be signed by us to be enforceable.

**Rhode Island Residents.** A consumer credit report may be requested in connection with this application or in connection with updates, renewals, or extensions of any credit granted as a result of this application.

**Utah Residents.** You are hereby notified that a negative credit report reflecting on your credit record may be submitted to a credit reporting agency if you fail to fulfill the terms of your credit obligations.

**Vermont Residents.**

a. NOTICE TO BORROWER: THIS IS A DEMAND NOTE AND SO MAY BE COLLECTED BY THE LENDER AT ANY TIME. A NEW NOTE MUTUALLY AGREED UPON AND SUBSEQUENTLY ISSUED MAY CARRY A HIGHER OR LOWER RATE OF INTEREST.

b. NOTICE TO CO-SIGNER: YOUR SIGNATURE ON THIS NOTE MEANS THAT YOU ARE EQUALLY LIABLE FOR REPAYMENT OF THIS LOAN. IF THE BORROWER DOES NOT PAY, THE LENDER HAS A LEGAL RIGHT TO COLLECT FROM YOU.



**Washington Residents.** Applicable to Borrowers entering into non-consumer purpose transactions only: ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.

**Wisconsin Residents.** No provision of a marital property agreement (including a Statutory Individual Property Classification Agreement pursuant to Sec. 766.587, Wis. Stats.), an unilateral statement under S. 766.59, or a court decree under S. 766.70 adversely affects the interest of the creditor unless the creditor, prior to the time the credit is granted, is furnished a copy of the agreement, statement, or decree or has actual knowledge of the adverse provision when the obligation to the creditor is incurred. The obligation evidenced by this Agreement is being incurred in the interest of the marriage or family of the Borrower(s) and Pledgor(s), if individuals.

### 34  Acceptance of Line of Credit Agreement and Usage

After considering the benefits and risks of the use of the Line of Credit, and after consulting with (or having had an opportunity to consult with) legal, accounting, and financial advisers, Borrower has determined that it is appropriate based on Borrower's financial situations and investment objectives.

**BY SIGNING THIS AGREEMENT, BORROWER ACCEPTS THE TERMS OF THE AGREEMENT AND ACKNOWLEDGES THE FOLLOWING:**

- Borrower has read and understands this Agreement (including the Line of Credit Application) and the risk associated with a Line of Credit and has read and understands the credit terms explained.
- Credit Advances from the Line of Credit will not be deposited into any Collateral Account or other brokerage or advisory account.
- There is no litigation, action, proceeding, or investigation pending or threatened against Borrower.
- Borrower will not be rendered insolvent by the execution, delivery, and performance of its obligations hereunder or by the consummation of the transactions hereunder.

**By signing below, each party signifies its intent to be legally bound by the provisions of this Agreement.**

Borrower (Signature): *ANDREW LLOYD* (DocuSigned, E357F119CFEF43A...)    Date: 6/24/2020

Borrower (Print Name): ANDREW LLOYD

Co-Borrower (Signature): _____    Date: _____

Co-Borrower (Print Name): _____

If Borrower is a Trust, please sign here on behalf of Trust:

Name of Trust: _____

Borrower/ Trustee (Signature): _____    Date: _____

Borrower/ Trustee (Print Name): _____    Date: _____

Co-Borrower/ Co-Trustee (Signature): _____    Date: _____

Co-Borrower/ Co-Trustee (Print Name): _____    Date: _____

ESB_009



## EXHIBIT A COLLATERAL ACCOUNTS

| Account Name/Title/Type | Account Number |
|---|---|
| ANDREW LLOYD | ▮▮▮▮▮▮ |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

**ESB_010**

**EXHIBIT B**



671 N. Glebe Rd
11th Floor
Arlington, VA 22203

October 21, 2020

**Subject: E*TRADE Line of Credit Account Closure**

| | | | |
|---|---|---|---|
| Applicant Name: | Andrew Lloyd | Creditor's Name: | E*TRADE Savings Bank |
| Applicant Address: | 40394 Hilltop Dr | Creditor's Address: | 671 N. Glebe Rd |
| | Lebanon, OR 97355 | | 11th Floor |
| | | | Arlington, VA 22203 |

Dear Andrew Lloyd,

Please be advised that your E*TRADE Line of Credit account is being closed for the following reason(s):

**Pledged brokerage account is no longer eligible collateral for the line of credit**

As a result of this action, your credit line has been restricted from taking any further credit advances. **Additionally, you will be required to pay off and close your line of credit account no later than November 4, 2020. If you do not take action to payoff and close your account prior to this date, E*TRADE Savings Bank will take liquidation action to complete these actions on your behalf.**

If you have questions, call us anytime at 800-ETRADE-1 (800-387-2331).

**PLEASE READ THE IMPORTANT DISCLOSURES BELOW.**

The E*TRADE Financial family of companies provides financial services, including trading, investing, investment advisory, and banking products and services, to retail customers.

Securities, investment advisory, commodity futures, options on futures and other non-deposit investment products and services are not insured by the FDIC, are not deposits or obligations of, or guaranteed by, E*TRADE Bank or E*TRADE Savings Bank, and are subject to investment risk, including possible loss of the principal amount invested.

Investment advisory services are offered through E*TRADE Capital Management, LLC, a Registered Investment Adviser.

Banking products and services are offered by E*TRADE Bank, a federal savings bank, Member FDIC, and E*TRADE Savings Bank, a federal savings bank, Member FDIC.

E*TRADE Securities LLC, E*TRADE Bank, E*TRADE Savings Bank, and E*TRADE Capital Management, LLC are separate but affiliated companies.

© E*TRADE Financial Corporation. All rights reserved.

**ESB_011**

Notice: The Federal Equal Opportunity Act prohibits creditors from discriminating against credit applications on the basis of race, color, religion, national origin, sex, marital status, age (provided the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The Federal agency that administers compliance with this law concerning this credit is the Bureau of Consumer Financial Protection, 1700 G Street NW, Washington DC 20006.

ESB_012